## CIRCUIT COURT OF LOUDOUN COUNTY

Lakeisha Brown

v.

Commonwealth Petroleum
Services, Ltd., et al.

Case No. (Law) 27187

Mark Brown

v.

Commonwealth Petroleum
Services, Ltd., et al.

Case No. (Law) 27188

BY JUDGE JAMES H. CHAMBLIN

September 30, 2003

During the consolidated bench trial of these cases on August 25, 2003, the Court took under advisement the admissibility of certain opinions of a chiropractor and the admissibility of the chiropractor's bills.

After consideration of the argument of counsel at trial and in the memoranda filed after trial, the chiropractor's opinions as to causation of the plaintiff's injuries, the reasonableness of his bills, and the necessity of his services are admitted into evidence. Further, the bills for the chiropractor's services to each plaintiff are admitted into evidence.

These cases arise out of a motor vehicle accident that occurred on June 20, 2002, on the ramp from the Dulles Toll Road to southbound Interstate 495 in

Fairfax County. Venue is proper in Loudoun County because Commonwealth Petroleum Services, Ltd. (CPS) has its principal place of business in Loudoun County. Lakeisha Brown was driving a Ford Expedition with her husband, Mark Brown, as a front seat passenger, on the ramp when a CPS truck driven by the Defendant, James Randall Biggs, Jr., struck the rear of a vehicle driven by Ram Gopalan traveling behind the Brown vehicle. The Gopalan vehicle was propelled into the rear of the Brown vehicle. The Browns claim personal injury as a result of the accident. Also, Ms. Brown asserts a claim for damage to the Expedition, which was owned by her.

After the accident, both Mr. Brown and Ms. Brown were treated by Christopher T. Oliver, a chiropractor, from July 2, 2002, to November 25, 2002. Dr. Oliver testified without objection that he treated Ms. Brown for cervical and thoraco-lumbar pain and discomfort and that he treated Mr. Brown for similar pain and discomfort.

The Defendants objected to the following:

(1) Dr. Oliver's testimony that the injuries suffered by both Mr. Brown and Ms. Brown were caused by the motor vehicle accident of June 20, 2002;

(2) Dr. Oliver's testimony that the bills he rendered for his services to Mr. Brown and Ms. Brown were reasonable in amount;

(3) Dr. Oliver's testimony that his services were reasonably necessary; and

(4) The admissibility of Dr. Oliver's bills.

The factual basis for the Defendant's objections is that Dr. Oliver is a chiropractor, not a medical doctor. The Defendants argue that a chiropractor cannot render an expert opinion that his bills were reasonably necessary and that the treatment reflected in such bills was rendered necessary, or caused, by a condition proximately resulting from the negligence of the defendants. I think that all parties would agree that, if Dr. Oliver were a medical doctor, for example, an orthopedic surgeon, then the Defendants would not be making the objections. Therefore, the issue is the extent to which a chiropractor in a personal injury case can render an expert opinion concerning the causation of the plaintiff's injuries, the necessity of his treatment, and the reasonableness of his bills.

The Defendants cite two cases, *Combs v. Norfolk & Western Ry.*, 256 Va. 490 (1998), and *John v. Im*, 263 Va. 315 (2002), for the proposition that only a medical doctor can express an opinion as to the cause of a physical human injury. In *Combs*, a biomechanical engineer was deemed not qualified to state an expert opinion regarding the cause of a physical human injury. The Supreme Court determined that the question of causation of human injury is a component part of a diagnosis, which in turn is a part of the practice of medicine as defined in Va. Code § 54.1-2900. Accordingly, a biomechanical

engineer who is not a medical doctor could not state an expert opinion as to causation. 256 Va. at 496-97.

In *John*, a licensed psychologist who was not a medical doctor was not qualified to render an expert opinion as to human injury. The *John* opinion cites *Combs* and uses the exact same reasoning in excluding the expert opinion of the licensed psychologist as to causation.

It is interesting to note that the opinion in *Combs* and the body of the opinion in *John* do not state that only a medical doctor may render an expert opinion as to the cause of human injury. Footnote 2 on page 321 of the opinion in *John* refers to "the general rule that only a medical doctor may render an opinion regarding the cause of a physical human injury." The opinion in the case of *Velazquez v. Commonwealth*, 263 Va. 95 (2002), referred to in footnote 2, for the SANE exception to the general rule does not state only a medical doctor may render the opinion as to causation. Footnote 2 is the only reference to the general rule that only a medical doctor may render such an opinion.

After reading the aforesaid cases, I think that the emphasis should be on how the Supreme Court reached its decisions than on focusing on the result.

In *Combs*, the Supreme Court began its reasoning by using the statutory definition of the practice of medicine as found in Va. Code § 54.1-2900 as including the diagnosis and treatment of human physical ailments, conditions, diseases, pain, and infirmities. Citing *Mosby's Medical Dictionary*, the term "diagnose" was found to be defined as "to determine the type and cause of a health condition on the basis of signs and symptoms of the patient." Progressing logically, the Supreme Court found that "the question of causation of human injury is a component part of a diagnosis, which in turn is a part of the practice of medicine." 256 Va. at 496.

The same logical reasoning can be applied to a chiropractor.

The Commonwealth of Virginia recognizes the practice of chiropractic as a healing art. The regulatory provisions as to chiropractors are found in Chapter 29 of Title 54.1 of the Code of Virginia, entitled "Medicine and Other Healing Arts." Chapter 29 includes Va. Code § 54.1-2900 through 54.1-2993.

In 1984, the Virginia legislature recognized that chiropractors could render expert opinions when it enacted Va. Code § 8.01-401.2, which provides: "A doctor of chiropractic, when properly qualified, may testify as an expert witness in a court of law as to etiology, diagnosis, prognosis, and disability, including anatomical, physiological, and pathological considerations within the scope of the practice of chiropractic as defined in § 54.1-2900."

Va. Code § 54.1-2900 defines the practice of chiropractic as "the adjustment of the twenty-four movable vertebrae of the spinal column, and assisting nature for the purpose of normalizing the transmission of nerve energy, but does not include the use of surgery, obstetrics, osteopathy, or the administration or prescribing of any drugs, medicines, serums, or vaccines.

The evidence presented at the trial shows that Dr. Oliver treated both plaintiffs within the definition of the practice of chiropractic in Va. Code § 54.1-2900. He adjusted their vertebrae in the cervical and thoraco-lumbar regions. ·

Under Va. Code § 8.01-401.2, a chiropractor may testify as an expert witness as to diagnosis within the scope of the practice of chiropractic as defined in Va. Code § 54.1-2900. I find that definition of "diagnose" as stated above as found in *Mosby's Medical Dictionary* is as applicable to "diagnosis" in the definition of the practice of chiropractic as it is applicable to the definition of the practice of medicine as the two practices are defined in Va. Code § 54.01-2900.

If a medical doctor may testify as to the cause of human injury because causation is a component of a diagnosis, then I see no reason why a chiropractor cannot similarly testify as to the cause of such injury provided his testimony is within the scope of the practice of chiropractic. There is evidence that Dr. Oliver's treatment of the plaintiffs falls within the scope of the practice of chiropractic; therefore, he is qualified to render an expert opinion regarding the cause of the injuries to the plaintiffs for which he provided treatment.

The Defendants did not object to the qualifications of Dr. Oliver as a chiropractor. As such, he may render an opinion as to the reasonableness of his bills. For the trier of fact, it is a question of weight to be given to such testimony as opposed to its admissibility. For the reasons stated above, Dr. Oliver may render an expert opinion that his services were reasonably necessary.

With the admission of the testimony of Dr. Oliver, the plaintiffs have laid the requisite foundation for the admission of the chiropractor bills.

In summary, all of the Defendants' objections to the testimony of Dr. Oliver are overruled, and his bills are admitted into evidence as Plaintiff's Exhibit 2 in Law No. 27187 and Plaintiff's Exhibit 2 in Law No. 27188.

December 15, 2003

These cases were tried together without a jury on August 25, 2003. The issue of the admissibility of certain opinions of a chiropractor and his bills was

taken under advisement and resolved by an opinion letter dated September 30, 2003. The opinions and bills were admitted into evidence. Final arguments were made on November 21, 2003.

After consideration of the evidence and argument of counsel:

In Law No. 27187, Lakeisha Brown is awarded a judgment against Commonwealth Petroleum Services, Ltd., and James Randall Biggs, Jr., in the amount of $2,500.00.

In Law No. 27188, Mark Brown is awarded a judgment against Commonwealth Petroleum Services, Ltd., and James Randall Biggs, Jr., in the amount of $3,500.00.

## Liability

These cases arise out of a motor vehicle accident that occurred at about 8:30 a.m. on Thursday, June 20, 2002, on the ramp from the Dulles Toll Road to southbound Interstate 495 in Fairfax County. Venue is proper in Loudoun County because Commonwealth Petroleum Services, Ltd., has its principal place of business in Loudoun County. Lakeisha Brown was driving a Ford Expedition with her husband, Mark Brown, as a front seat passenger, on the ramp when a CPS truck driven by the Defendant, James Randall Biggs, Jr., struck the rear of a vehicle driven by Ram Gopalan traveling behind the Brown vehicle. The Gopalan vehicle was propelled into the rear of the Brown vehicle. The Browns claim personal injury as a result of the accident. Also, Ms. Brown asserts a claim for damage to the Expedition, which was owned by her.

I find that Biggs' negligence caused the Gopalan vehicle to collide with the Brown Expedition. At trial, both Defendants conceded that Biggs was negligent in colliding with the Gopalan vehicle. However, they did not concede that Biggs' negligence caused the Gopalan vehicle to collide with the Brown vehicle.

Biggs looked down at a clock on the truck's dashboard. By the time he looked up, he was unable to stop before hitting the Gopalan vehicle. It is clearly foreseeable that a rear-end collision could propel the vehicle struck in the rear to collide with the vehicle in front of it, especially in a line of cars on a ramp to an interstate highway. The CPS truck caused considerable damage to Dr. Gopalan's Lexus. Its hood was up in a "V", the rear was smashed up to the rear window, and the driver seat was turned to the right. After the collision, Dr. Gopalan was unable to reach the pedals because the driver's seat also went back. His vehicle accelerated after the collision.

The Defendants assert that Dr. Gopalan was following too close to the Brown vehicle, and this is an intervening cause of the collision. The argument is based on Ms. Brown's testimony that the Gopalan vehicle was two to three feet behind the Expedition. However, her testimony is contrary to her other evidence. Ms. Brown testified that she was "not good with distances." Dr. Gopalan testified that he was twenty feet behind the Brown vehicle when the CPS truck collided with him. Dr. Gopalan was in a better position to observe the distance between the two vehicles. He was looking forward while Ms. Brown was looking into a rear view mirror. Ms. Brown did not testify exactly when she observed the Gopalan vehicle. I find the testimony of Dr. Gopalan to be more credible on the issue of the distance between his vehicle and the Brown vehicle at the time of the accident.

The vehicles were going somewhere between five and twenty-fives mile per hour at the time of the accident. Biggs testified to a speed of twenty to twenty-five miles per hour. Dr. Gopalan testified to a speed of five to ten miles per hour when he was struck from behind by Biggs. Ms. Brown testified to a speed of about ten miles per hour at impact. Mr. Brown testified to a speed of faster than fifteen to twenty miles per hour. He saw the CPS truck going "really fast" and swerving over onto the ramp prior to the collision. Biggs was going fast enough to cause considerable damage to Dr. Gopalan's Lexus and to damage the bumper, trailer hitch, undercarriage, and left rear quarter panel of the Expedition.

I find Biggs' negligence caused the Gopalan vehicle to collide with the Brown vehicle. The Defendants stipulated that Biggs was operating the truck during the course of his employment by CPS. Therefore, CPS is equally liable with Biggs for the damages suffered by the Browns as set forth below.

### Damages

The Browns argue that, in addition to pain and suffering, they suffered the following damages caused by Biggs' negligence: one visit by each to Dr. Wijelilleke, lost wages, and chiropractic care. Also, Ms. Brown asserts a claim for $250.00 for damage to the Expedition. Each item of damage is addressed below.

### Dr. Wijelilleke's Bills

Mr. Brown testified that the "hard impact" of the collision jolted him and he almost hit his head on the dashboard. He had on his seat belt, but the airbags of the Expedition did not deploy. He was "hurting a little bit." He complained of neck pain and, as a result, was placed in a neck brace and

transported to the emergency room at Fairfax Inova Hospital. At the hospital, he was examined, x-rayed, given a prescription medication for pain, and told to seek further assistance. He was released without hospitalization. The next day, he testified, he could barely move. Yet, he did not see a doctor until June 26, 2002. He offered no explanation for the delay. He also testified that he stopped taking the pain medication because it made him groggy.

Mr. Brown testified that he exercised regularly before the accident but that, after the accident, he had not exercised, either jogging or lifting weights.

Initially Mr. Brown testified that he first saw a doctor, Dr. Wijelilleke, a family physician, on July 2, 2002. He later changed his testimony to seeing the doctor on June 26, 2002. His counsel stated in final argument that his bill with Dr. Wijelilleke was $130.00, but I do not recall any such testimony. No such doctor's bill was admitted into evidence.

Dr. Wijelilleke examined Mr. Brown, prescribed pain medication, and suggested that he see a chiropractor. Although Mr. Brown did not testify to it directly, it is a fair inference that he saw Dr. Wijelilleke for injuries received in the accident.

Ms. Brown testified that she felt a "shooting pain" from her neck down her back after the accident. She was transported to the Fairfax emergency room with a collar on her neck. She was examined, x-rayed, given a prescription for pain medication, and released. The next day, she testified, she felt terrible. She also first saw a doctor, Dr. Wijelilleke, on the same day as Mr. Brown, June 26, 2002. She attributed the six-day delay in seeing the doctor to the doctor's schedule. Like Mr. Brown, she initially had the wrong date. She did testify that Dr. Wijelilleke's bill for the visit was $116.50. She testified that she saw Dr. Wijelilleke for the follow-up recommended by the emergency room doctor. She was examined by Dr. Wijelilleke and given prescription pain medication. Ms. Brown did not testify that Dr. Wijelilleke referred her to a chiropractor. Later in her testimony Ms. Brown stated that she got no medications at the emergency room and that Dr. Wijelilleke gave her pain medication only for a headache.

Ms. Brown testified that she still has morning aches and pains, still has shooting pains, does stretching exercises, and is regaining her mobility.

Both Plaintiffs have shown that the respective bills for Dr. Wijelilleke's services were incurred as a result of the accident. However, as explained in more detail below, they misrepresented their employment status to get Medicaid to pay for Dr. Wijelilleke's services.

*Lost Wages*

Mr. Brown testified that, at the time of the accident, he had been working for six weeks for a temporary employment service with three different jobs for forty hours per week at $15.45 per hour. However, and very significantly, when Mr. Brown saw Dr. Wijelilleke on June 26, 2002, he noted on a form that he was "unemployed." He testified that he put down that he was "unemployed" because he was not working that day. I do not accept this explanation. He did it to get Medicaid coverage. He put on the form that he had Medicaid coverage. Dr. Wijelilleke is a doctor who accepts patients on Medicaid. Mr. and Ms. Brown both knew that they would not be eligible for Medicaid if they were working or had a certain level of income. Mr. Brown deliberately misrepresented his employment status in order to secure medical services at the taxpayers' expense. This adversely impacts on his credibility. He admitted that he returned to work on July 8, 2002.

During his testimony, Mr. Brown testified that he lost $1,500.00 in wages from June 20, 2002, to July 8, 2002. As a temp, he was only paid when he worked. He was not going to work on June 20, 2002. He and Ms. Brown were on their way to a job fair when the accident occurred. There were only ten working days between June 20 and July 8, 2002. At $15.45 per hour for eight hours per day, Mr. Brown would have earned $1,236.00 in ten days, not $1,500.00.

In final argument, Mr. Brown's counsel argued that his lost wages were ten days at eight hours per day at $15.76 per hour. My recollection is that Mr. Brown testified that his rate was $15.76 per hour when he became permanently employed with Beazar Homes after the accident.

At the time of the accident, Ms. Brown was employed part time for thirty hours per week as a pharmacist technician making $14.51 per hour. She testified that she missed eight or nine days of work as a result of the accident. In her answers to interrogatories propounded by the Defendants, she stated that she missed ten days of work between June 20 and June 30, 2002, for a total of 84½ hours at $14.51 per hour for a total claim of $1,118.84. Actually, 84½ hours at $14.51 is $1,226.10, a math error. Also, between June 20 and June 30, 2002, there are two weekends. She only worked thirty hours per week. She is not entitled to claim lost wages just because, as she testified, there were 84½ hours of work available that she could have taken during that time.

In his final argument Ms. Brown's counsel asserted that she lost eight days of work at six hours per day at $14.51 per hour for a total of $696.48, far less than the $1,118.84 she claimed during her testimony.

Ms. Brown testified that Dr. Wijelilleke was selected from a list of Medicaid doctors. On a form for Dr. Wijelilleke, Ms. Brown put "N/A" for her employment status. She said this indicated "not applicable." I find that she deliberately misrepresented her employment status to get her doctor's services paid by Medicaid.

I conclude from all the evidence that Mr. and Ms. Brown did miss work as a result of the accident. I decline to find that they had no lost wages because they falsely represented to Dr. Wijelilleke that they were not employed. However, their willingness to misrepresent their employment status does affect their credibility, especially as to the extent of their injuries. It also shows to me their attitude toward money and how to get someone else to pay for medical services rendered to them.

I also find it very interesting that the Plaintiffs offered very little evidence of their treatment at the emergency room on the day of the accident and no evidence whatsoever of the charges for the emergency room services. They make no claim for the charges obviously incurred at the emergency room as a result of the accident.

### Chiropractic Care

The largest component of the Plaintiffs' alleged damages is the treatment they received from Christopher T. Oliver, a chiropractor. For the reasons stated in the opinion letter dated September 30, 2003, the opinions of the chiropractor and his bills were admitted into evidence. However, just because the opinions and bills are in evidence, the trier of fact does not have to blindly accept them. As with any expert testimony, the trier of fact must consider the basis for the opinion and the underlying data used by the expert. Further, the trier of fact can use his common sense. The weight to be given to testimony of an expert lies with the trier of fact.

After consideration of all the evidence and the circumstances of these cases, I give very little, if any, weight to the testimony of Dr. Oliver. I think that Dr. Oliver is a "hired gun" who unnecessarily over-treated the Plaintiffs just to run up their medical expenses in an effort to get a greater recovery for the Plaintiffs, and, hence, more money for himself. He had a definite monetary interest in the outcome of these cases.

The Plaintiffs were referred to Dr. Oliver by their attorney. Dr. Oliver started an extensive course of treatment (33 treatments for Ms. Brown and 30 treatments for Mr. Brown) on July 2, 2002. There was no evidence that the doctors at the emergency room had recommended follow up orthopedic evaluation or treatment, yet, within twelve days, the Browns had seen a lawyer

who sent them to a chiropractor. Dr. Oliver's bill for Ms. Brown is $5,293.00, and his bill for Mr. Brown is $5,083.00.

Dr. Oliver made the same diagnosis for both Mr. and Ms. Brown. He embarked on the same course of treatment for each; he just saw Ms. Brown three more times. He indicated at the beginning that it would take 25 to 30 treatments, almost exactly as it turned out. He indicated that on the 30 plus visits between July 2, 2002 and mid November 2002 that their symptoms continued, but on the same date, November 25, 2002, each had progressed enough that he discontinued treatment. It is all too incredible to be merely a coincidence.

The Browns got no real treatment for their alleged injuries until over two weeks after the accident and, significantly, after their attorney referred them to a chiropractor who was willing to treat them without requiring payment at the time of treatment. It is reasonable to infer that Dr. Oliver knew that his best chance of being paid was to treat the Browns extensively for injuries he opined they received in the accident in expectation of a large recovery by them from which he would be paid. He treated them in 2002 for fees exceeding $10,000.00. The Browns have never paid Dr. Oliver anything toward his bill.

Finally, I cannot ignore the inconsistencies pointed out by the Defendants between Dr. Oliver's handwritten examination notes and his typewritten "Exam/Daily Notes/Progress Report." For example, Dr. Oliver's handwritten notes from an examination of Mr. Brown on September 30, 2002, indicate an essentially normal exam while his typed "Notes" reflect almost the exact opposite. It appears to me that the typed "Notes" are "canned." They contain a considerable number of identically worded entries for different dates. His notes have an aura of being manufactured.

## Property Damage

I think that Ms. Brown has presented sufficient evidence that she was damaged in the amount of $250.00 for the deductible she had to pay when her Expedition was repaired after the accident.

## Conclusion

I agree with Defendants' counsel that this is a case of "economic opportunity" for the Plaintiffs. I think that the Plaintiffs received some minor injuries in the accident and did lose some time from work, but their injuries were not as serious as testified to by them and the chiropractor. They were treated beyond what was reasonably necessary by the chiropractor. I cannot ignore the fact that the Plaintiffs were well aware that the truck belonged to an

oil company, which probably had the resources to pay a large settlement or verdict. The Plaintiffs were not very credible on matters that could easily be demonstrated, such as lost wages or when they saw a doctor. They inflated their claims for lost wages in their discovery responses. They misrepresented their employment status in order to gain an economic advantage. They are entitled to some compensation, but not as much as they request.